[Civ. No. 4873. First Appellate District, Division Two.—June 3, 1924.]

## GEORGE M. FORREST, Appellant, v. J. S. BURT, Respondent.

[1] CONTRACTS—TRANSFER AS SECURITY—BREACH BY TRUSTEE—DAMAGES—REMEDY—ACCOUNTING.—In this action for damages for alleged breach of contract, the evidence having shown that plaintiff executed to defendant a bill of sale of certain goods, wares and merchandise connected with a business theretofore owned and conducted by plaintiff, upon the express agreement that defendant was to carry on said business and build up the trade for plaintiff and allow plaintiff to work in said business receiving a specified wage until the business warranted plaintiff drawing or receiving more for his services and to then reconvey to plaintiff said business, the trial court did not err in directing a verdict for defendant upon the grounds that the transfer was merely as security for moneys advanced by defendant, that plaintiff had failed to prove damage because of his nonemployment in the business, and that plaintiff's remedy was an action in equity for an accounting, and not an action at law for damages.

[2] ID.—RIGHT TO HOLD SECURITY.—In such action, although the word "security" was not used by the parties, the agreement between plaintiff and defendant having been that the bill of sale, in legal effect, was taken as security to secure the repayment of moneys advanced by defendant to plaintiff, defendant was entitled to hold the property until his account has been settled and the amount of his advances ascertained and repaid to him.

---

(1) 11 C. J., p. 744, sec. 583 (Anno.); 17 C. J., p. 1059, sec. 361; 39 Cyc., p. 469. (2) 11 C. J., p. 409, sec. 13, p. 552, sec. 248.

APPEAL from a judgment of the Superior Court of Alameda County. Mortimer Smith, Judge. Affirmed.

---

1. See 10 Cal. Jur. 1165; 26 R. C. L. 1074.
2. See 21 R. C. L. 651.

The facts are stated in the opinion of the court.

Franklin P. Bull for Appellant.

Olin L. Berry for Respondent.

STURTEVANT, J.—The plaintiff commenced an action against the defendant to recover a judgment for money. The defendant answered and a trial was had before the trial court sitting with a jury. The plaintiff pleaded his claim in three counts. In the first count he pleaded that he sold and delivered to the defendant the goods, wares and merchandise known as "Quality Electric Motor Co." for the agreed sum of $8,500. In the second count he pleaded the sale of the same property for the reasonable value of $8,500. In the third count he pleaded the facts, and in doing so he charged that on the sixth day of October, 1921, he executed to the defendant a bill of sale of the property, "and defendant was to carry on said business and build up the trade for plaintiff, and allow plaintiff to work in said business receiving for his wages the sum of twenty dollars ($20) per week until the business warranted plaintiff drawing or receiving more for his services and to then reconvey to plaintiff said business"; that plaintiff has duly performed, etc.; that defendant has, since the twenty-second day of June, 1922, refused to allow plaintiff to work in said business and has refused to reconvey to plaintiff the property; that the reasonable value of the property is $8,500; that the reasonable value of the goodwill of the business is $2,500; that after being deprived of a place to work, the plaintiff accepted other employment at a lower wage and has been damaged in the sum of $1,000; that plaintiff has been damaged in the further sum of $12,000, and that plaintiff prays judgment for $12,000.

[1] On the trial of the case the plaintiff abandoned the first count and second count, and after both parties had introduced their evidence, the trial court instructed the jury to return a verdict for the defendant. In ruling, the trial court used this language: "I will speak plainly to you; as far as the complaint is concerned, and as far as the testimony of this plaintiff himself is concerned, he testified this property was assigned; he transferred it to the defendant

Burt as security for what was given him and money advanced to the business and to be retained by him until such time as that business would be sufficient to pay Burt back, at which time the business was to revert to Forrest. Under that consideration and stipulation he made the bill of sale. As to damage by way of employment, you have failed to prove damage. You have not brought a single witness to show he has been damaged. In fact, he has been benefited to the extent of $25 a week. In my opinion you have sought the wrong remedy. You should have brought an action in accounting. This is an action for breach of contract." An examination of the record discloses that the trial court did not err in directing the verdict, and that the reasons assigned by the trial court for so directing the verdict were in all respects sound.

On the sixth day of October, 1921, the plaintiff was the undisputed owner of the Quality Electric Motor Co., a business then being conducted at 198 Twelfth Street, Oakland. The plaintiff had theretofore received numerous loans from the defendant. The exact amount had never been ascertained and the balance remaining unpaid was, and is, in dispute. However, as we understand the record, the plaintiff concedes that there was $1,500 remaining unpaid and some more moneys besides. The defendant claims that at said time there was a much larger sum owing and unpaid. Besides these moneys, on October 6, 1921, the plaintiff owed for merchandise purchased but not paid for the further sum of $700, which was falling due in installments nearly every day. In addition to these financial obligations there was an outstanding unsettled liability of the plaintiff for the support of a child by a former marriage. The plaintiff testified that he had on said date a balance of seventy-five cents in the bank and did not possess any other means. On or about the date that the bill of sale was executed the plaintiff and defendant had a talk regarding the execution of the paper. A part of that talk was had in the presence of Mr. Coffman, who afterwards wrote out the paper. As to the exact language used by the parties, the witnesses do not relate the incident in the same langage, but the variance is slight. In reply to questions propounded by his own counsel, the plaintiff stated that the conversation between him and the defendant which led to the making of the bill of

sale, commenced with a talk regarding the possibilities of litigation arising against the plaintiff on his liability to support his child. The defendant knew of the circumstances, and after he had put a considerable amount of money in the business he stated to the plaintiff that Mrs. Chase, the plaintiff's former wife, was liable to come up here and take the business away from the plaintiff. The defendant thereupon suggested that the plaintiff had better make out the bill of sale, and he did so. But in this behalf the plaintiff testified, "I did not sell this property to him. It was not transferred to him as security, there was nothing said about security. The Court: Q. It was transferred to keep the authorities away from you on account of your not supporting the child? A. It was done by J. S. Burt's advice. Mr. Bull: Mr. Burt was afraid this property would be attached? A. Yes, and the money he had in there would be lost." On cross-examination the witness testified: "I discussed the question of attachment and possible process against this business in the presence of Mr. Burt and Mr. Coffman. . . . I did not have any fear at all of Mrs. Chase causing any trouble, but Mr. Burt did. At that time Mr. Burt had advanced me $1,500 or more. He was uneasy. To allay his uneasiness I consented that the bill of sale be made. He told me if I gave him the bill of sale he would build up the business for me and put in any amount that was required to run it. It was not security on my part because I did not fear. When I made this arrangement I knew that Mr. Burt was going to continue to put money into the business. . . . I had known him since 1912, and he had that much faith in my ability to make good. It was done for pure friendship from him to me. It was no partnership of any kind or nature. There was nothing said about loss in the business. As the business grew up he was to take out of the profits the money he had advanced. He was not to draw anything out of the business until he was paid. I was to repay him. . . . In other words, I put in the property I had, my time and experience as a mechanic against the money he put up. I drew out enough to live on and that is all." On the other hand, Mr. Burt testified that fearing attachments he declined to make further advances unless he obtained security. That the kind of security was discussed and it was debated whether the defendant should take a bill of sale

or a chattel mortgage. It was deemed advisable to take a chattel mortgage because a chattel mortgage could be used as security to protect future advances. After the sixth day of October, 1921, the plaintiff commenced to act under the terms of the bill of sale and drew out $20 per week, and continued so to act until the twenty-second day of June, 1922. During that period of time Mr. Burt made further advances. The exact amount of those advances had not prior to the trial been ascertained, and during the trial the respective parties did not purport to settle the account. As we understand the record, it shows that additional advances to the amount of $15,000 or $16,000 were made. In the latter part of June, 1922, the plaintiff and defendant commenced to discuss the advisability of taking a different location for the business. The location selected was a building on the opposite side of the street. The moving of the plant had commenced. Before the moving was completed the plaintiff left. The circumstances of his leaving and for the period of time, etc., were testified to by him as follows: "I left when the majority of stuff was moved. I left when there was nothing there but the office and the heavy machinery to be moved. About a month and a half before that I told Mr. Burt I was going to take my wife out to the Yosemite and her mother was going along, and some of our friends were going along, and we would be right back. I did not tell Mr. Burt and Mr. Hutchinson that I was going away for two weeks. I went away Friday night and was back Monday. Mr. Burt came to my house. After I came back I went to the shop about three days afterwards. I don't remember who I saw. After I came back Mr. Burt came down to my house. He asked me—he thought I made a big mistake—first he told me he had a good man in my place and he needed my services no longer. He didn't tell me who the man was. I went either that night or the next night. I went there to see him about the things I had there in that office. That is the time he demanded of me $22,000. I was not away two weeks. The reason I went away was that I had had the flu and previous to that I had been working so hard and late at night that my health was not any too good, and my wife's health was not any too good either. So I decided to take her up to the Yosemite for a little rest. I thought the trip away from the shop would do

me good." Aside from the foregoing there is no other testimony by the plaintiff concerning discharge or prevention. An employee in the shop, Mr. Hutchinson, testified that on the date that the plaintiff left, the plaintiff stated to him, "that conditions were not such that he was looking for, and he said he was going to leave. I asked him how he thought Mr. Burt would take it and he said he did not care."

We do not find any testimony in the record that the appellant was, by the terms of the oral agreement, to be kept in employment during any particular length of time. The testimony which we have quoted above shows that the appellant quit the employment of his own volition, and that he was not discharged; that after he quit another man was put in his place, and when the appellant learned of that fact he made no objection whatsoever, but went to the office to get his things. Furthermore, the entire record shows that the quitting or discharging did not create a damage. As the trial court remarked in granting the directed verdict, the appellant gave up $20 a week to accept employment at a wage varying from $48 to $50 a week. He was benefited rather than injured. However, in passing, it should be observed that, as we view the record, $20 was not by the parties to be considered as a wage. It was by them deemed to be an advance by the trustee to the trustor. True, the appellant was to devote his time to managing the shop. All his time and energy was to be devoted to the building up of the business. In that manner the time would be shortened within which the business would be turned back to him discharged of its debts. To make that time as short as possible, the parties agreed upon the sum of $20 per week as an advance, well knowing at the time that the value of the appellant's services to the business might readily exceed $50 a week. But in connection with the employment theory the appellant introduced no evidence showing the reasonable value of his wages in the shop, and therefore neither the trial court nor this court can ascertain whether he was damaged or not damaged.

[2] As to the main branch of the case, it is patent that the agreement between the plaintiff and the defendant was that the bill of sale was, in legal effect, taken as security to secure the repayment of moneys advanced. The fact that the word security was not used by the parties, as the ap-

pellant claims, is not determinative of that fact. Having received the plaintiff's property to secure the repayment to him of advances made to the plaintiff, the defendant was entitled to hold the said property until his account had been settled, and the amount of the advances ascertained and repaid to him. As stated above, an accounting has never been had. While the plaintiff is entitled to maintain an action in equity for an accounting, he is not entitled to maintain an action at law. (2 Perry on Trusts, sec. 843; 39 Cyc. 469.)

We find no error in the record. The judgment is affirmed.

Nourse, J., and Langdon, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 31, 1924.

All the Justices concurred.